**FILED**
NOV 21 2012
Clerk, U.S. District Court
By: /s/ _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Kansas City Docket)

| | |
|---|---|
| UNITED STATES OF AMERICA, | }<br>}<br>} |
| Plaintiff, | }<br>} |
| v. | } No. 12-20015-1-CM<br>} |
| CONNIE EDWARDS, | }<br>} |
| Defendant. | } |

## PLEA AGREEMENT PURSUANT TO FED. R. CRIM. P. 11(c)(1)(C)

The United States of America, by Sheri McCracken, Assistant U.S. Attorney, and Defendant Connie Edwards, the defendant, personally and by and through her attorneys, Kirk C. Redmond and Melody J. Evans, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure:

1. **Defendant's Guilty Plea.** If the Court permits, the defendant agrees to plead guilty to Count One of the Third Superseding Indictment, which charges a violation of conspiracy to possess with intent to distribute a mixture and substance containing Oxycodone, a mixture and substance containing Hydrocodone, a mixture and substance containing Methadone, a mixture and substance containing Morphine, and a mixture and substance containing Methamphetamine, all of which are controlled substances, and with death and serious bodily injury resulting from the use of such substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2; Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2. By entering into this plea agreement, the defendant admits to knowingly committing this offense, and to being guilty of this offense. The defendant understands

that the maximum sentence which may be imposed as to Count One of the Third Superseding Indictment to which the defendant has agreed to plead guilty is not less than 20 years imprisonment and not more than life imprisonment, not more than a $1,000.000 fine, no less than 3 years supervised release, and a $100 mandatory special assessment. If the defendant has a prior felony drug offense conviction, the penalties are not less than life imprisonment, not more than a $2,000,000 fine, not less than 6 years supervised release, and a $100 special assessment fee. The United States agrees to move to dismiss the remaining counts of the Third Superseding Indictment at the time of sentencing.

2. **Forfeiture of Assets.** The defendant also pleads guilty to and agrees not to contest the criminal Forfeiture Allegation I contained in the Third Superseding Indictment. Defendant agrees to the imposition of a joint and several forfeiture judgment against him in the amount of $632,930 which amount represents the amount of proceeds derived directly or indirectly from the criminal violations in Count 1 or was used directly or indirectly to facilitate the criminal violations in Count 1. The defendant acknowledges and agrees that the forfeiture shall not be deemed an alteration of defendant's sentence or this agreement. The defendant acknowledges and agrees that the forfeiture of the currency shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. Defendant agrees to the immediate entry of the preliminary order of forfeiture. Defendant freely, voluntarily, knowingly and intelligently waives any right to collaterally attack any matter in connection with this prosecution and sentence, including the forfeiture of assets.

3. **Factual Basis for the Guilty Plea.** The parties agree the facts constituting the GOVERNMENT COULD PRESENT THE FOLLOWING AT TRIAL THE offense ~~to which the defendant is pleading guilty are~~ as follows:

2

Commencing on or about November 1, 2007, and continuing to on or about February 28, 2012, the defendant, Connie Edwards, combined, conspired and agreed with Brittany Edwards, Brandi Bivens, Angela Mitchell, Tamara Ledom, Dustin Price, Shirley Price, Joel Keith Price and others to distribute and to possess with the intent to distribute oxycodone, hydrocodone, methadone, morphine, and methamphetamine in the District of Kansas. Specifically, in early 2010 Franklin County Drug Enforcement Unit (hereinafter FRDEU) received information from a confidential informant (hereinafter CI) that Connie Edwards has been selling oxycodone, morphine and other prescription pills in Ottawa, KS. The confidential informant stated that Edwards sells prescription pills and trades pills for rent. The CI stated that Edwards has a basement full of stolen property and has several people in the community selling pills for her.

On the afternoon of May 9, 2009, William Thomas Powell purchased hydrocodone, methadone and carisoprodol from Tamara Ledom and Connie Edwards at Edwards residence in Ottawa, Kansas. Ledom had taken the prescription pills and crushed them into a powder which was sold to Powell as purported methamphetamine. Shirley Price was also present at Edwards residence but did not participate in the sale. Later that evening Powell purchased prescription pills from Edwards who delivered the pills to Powell in a van outside the Hidden Meadows apartment complex in Ottawa, Kansas. Dustin Price and Brittany Edwards witnessed the second transaction. Powell then ingested the pills and injected the substance he believed to be methamphetamine intravenously. On May 10, 2009, Powell was found unconscious in the living room of his mother's residence. He was taken to the hospital where he was pronounced dead. An autopsy was performed which revealed that Powell had died as the result of a polydrug toxicity. Toxicology confirmed the substances which were the cause of Powell's death were methadone, hydrocodone and carisoprodol.

On March 1, 2010, CI-567 made a controlled purchase of three Xanax tablets and one 60 mg oxycodone tablet from Edwards at her residence located at 412 S. Sycamore, Ottawa, KS. The local utility department has Rick Robinson listed for the address of 412 S. Sycamore. The utility company also showed the following properties in Ottawa, KS, under Robinson's name;

| | |
|---|---|
| 415 Grant | 627 N. King |
| 816 Lincoln | 119 S. Poplar |
| 412 S. Sycamore | 931 Walton |
| 727 S. Mulberry A and B | 936 Hamblin |

On March 8, 2010 CI-567 made a controlled purchase of three xanax bars and one 80 MG oxycodone from Edwards at her residence located at 412 S. Sycamore. During the next several weeks surveillance was conducted at the residence of 412 S. Sycamore. At this time several photographs were taken of many different subjects coming and going from the residence. The subjects would enter the residence and stay for a short time and then leave. One male subject, who frequented the residence, was identified Dustin Price.

On April 5, 2010, FRDEU made contact with Garilee Blurton, after she asked to speak with the police regarding drug activity in Ottawa. Blurton provided the following information: Blurton was addicted to methadone and has been buying pills from Edwards for the last nine months. Edwards keeps a ledger which includes what people owe her and she thinks she is being watched and has moved her pills to Shirley Price's house. Price lives at 1038 S. Locust, Ottawa, KS. Price sells the pills and gives the money to Edwards. The people who live in Edwards' rental houses pay her in pills. According to Blurton, Edwards, Joel Price and Shirley Price all go to a doctor in Paola but

---

she does not know the doctors name. Blurton also said that Edwards usually drives the burgundy Buick.

On April 29, 2010, surveillance was established on Edwards as she was driving the red Buick. She was parked at 1038 S. Locust. Edwards was talking to a male subject identified as Dustin Price. Edwards drove to 1742 Elm # 2, picked up Brandi Bivens and then drove to Olathe, KS. Brandi Bivens is the daughter of Edwards.

On May 3, 2010, FRDEU Det. Procaccini conducted an interview at the Franklin County jail with Charles Flemming. Flemming said he could purchase Oxycodone from Bivens. Flemming stated that he had just purchased oxycodone from her a few days ago.

On May 11, 2010, surveillance observed both Edwards and Bivens at the Kramer drug store, where Bivens picked up 140 Oxycontin tablets.

On June 15, 2010, Detective Mike Reed received information from an informant that a woman named Shirley (Price) who lives in the 1000 block of Locust was selling pills. The informant stated that approximately a week ago a male subject stole a bunch of pills and ran from the house. Shirley Prices' boyfriend ran out of the house and shot at the subject. The informant also said Shirley Prices' dealer is a woman named Connie (Edwards) and Edwards had cut Shirley Price off until she paid $900.00 for the pills. The informant stated that Shirley Price's boyfriend always has a gun next to him or in his lap and believes his name is David LNU[1].

On June 23, 2010, surveillance observed both Edwards and Bivens at the residence 412 S. Sycamore. Bivens was observed walking normally. Surveillance followed them to Kramer Pharmacy located at 134 S. Main Street, Ottawa. Main St., Ottawa, KS and Bivens was observed walking with a limp.

On July 1, 2010, Detective Jeremi Thompson went to 1038 S. Locust to attempt to gain information on the male subject living at the residence with Shirley Price. A vehicle parked in the yard of the residence had a for sale sign on it. Detective Thompson made contact with Shirley Price at the door of the residence and asked about the vehicle. A male subject identified as David Asbury came outside and talked with Det. Thompson about the vehicle. While talking to Asbury, he said, "There goes my landlady." Detective Thompson saw a Buick drive south on Locust street and Edwards was driving the vehicle.

On July 20, 2010, FRDEU collected the discarded trash from 412 Sycamore. The following items were collected from the trash: pharmacy receipts for Shirley Price, Joel Price and Edwards; a large piece of junk mail with handwritten numbers on it; and a Peoples Bank transaction receipt for a large deposit and a balance of $8000. The physician on all the prescriptions was Dr. Kerri Fellows.

On July 28, 2010, FRDEU interviewed Michelle Feltner at the Franklin County Jail. Feltner stated that she has been getting Oxycodone from Brandi Bivens and also gets pills from Edwards and Shirley Price. Feltner stated that she goes to Bivens' trailer 2-3 times a weeks to gets 3 to 4 oxycodone pills and she calls Edwards 3-4 times a week and Edwards delivers 4-5 oxycodone pills to her residence.

On August 10, 2010, surveillance was conducted on the residence of Bivens. A red truck registered to Henry Mitchell and Angela Mitchell was parked at Bivens' trailer. The vehicle was

---

[1] "LNU" last name unknown.

observed as it left the residence and drove to Walgreens. The truck pulled up to the front of the store. Bivens got out of the passenger seat and walked with a limp into the store. The truck drove around to the pharmacy window and then pulled back to the front of the store. A female subject identified as Angela Mitchell got out of the truck and rented a movie in the red box. Both Bivens and Mitchell got in the vehicle and drove back to the Bivens' residence.

On August 6, 2010, CI- 565 made a controlled purchase of three oxycodone tablets, one 80 mg, one 60 mg and one 20 mg, from Bivens at her residence located at 1742 S. Elm #2.

On August 11, 2010, FRDEU collected the discarded trash from 412 Sycamore. From the trash, FRDEU collected prescription receipt for Shirley Price for 120 count, Carisoprodol, a muscle relaxant. A Great Southern bank receipt was also collected.

On August 17, 2010, FRDEU collected the discarded trash from 412 S. Sycamore. The following items were collected from the trash: three empty prescription pill bottles without a label, one of which was from Kramer Pharmacy for 100 Oxycodone 20mg tablets for Edwards; two Great Southern Bank ATM receipts, one dated 08/05/2010 was a checking inquiry showing a balance of 401.21 and the second receipt dated 08/06/2010 was a withdrawal from checking for 290.00; a prescription receipt dated 7/13/2010 from Kramer Pharmacy for Shirley Price that was paid for in cash; a receipt for Carisoprodol 120 count 350 mg tablets (prescription number matches the other receipt); and hand written notes that had prices and quantity listed.

On August 18, 2010, SA Fruit received information from the Kansas Attorney General's office about the state medical assistance being provided to Edwards and Bivens. This information included prescription type, quantity, prescribing physician and pharmacy used. The same records were requested for Joel Price, Shirley Price, Rick Robinson and Angela Edwards Mitchell. No records were found for Robinson and Mitchell. The following information was received on the other individuals: Since 2009 to present Edwards received; 1320 Methadone tablets, 1670 Hyrdrocodone tablets, and 380 Oxycodone tablets. Dr. Kerri Fellows has prescribed Edwards 19 prescriptions. Since 2009 to present Bivens received; 1056 Morphine tablets, 351 Hydrocodone tablets, 432 Oxycodone tablets, and 1520 Oxycontin tablets. Since October 2008 to present Joel Price received; 90 Methadone tablets, 2130 Oxycodone tablets, and 2720 Morphine tablets. Dr. Kerri Fellows has prescribed Joel 39 prescriptions. Since January of 2008 Shirley Price received; 4380 Oxycodone tablets, 4230 Alprazolam (Xanax) tablets, 3726 methadone tablets, and 60 Hydrocodone tablets. Dr. Kerri Fellows has prescribed Shirley Price 111 Prescriptions.

On August 24, 2010, Detective Thompson went to the Franklin County Register of Deeds office and requested a list of all properties owned by Rick Robinson and discovered that all properties had been given to Angela Edwards Mitchell in 2002 as a gift from Connie Edwards. Det. Thompson also contacted the Franklin County Treasurer to determine who was paying the property tax on all the properties used for the illegal distribution of prescription drugs. Det. Thompson was told that Mitchell owed back taxes and Rick Robinson recently brought in a check for $500.00. Det. Thompson received a copy of the check which was a Peoples bank check from an account for Angela Edwards Mitchell.

On August 30, 2010, Det. Procaccini was contacted by Officer Matt Rodgers from the Ottawa Police Department. Officer Rodgers stated that he had arrested a subject for drug driving under the influence and the arrestee wanted to talk to someone about where she buys her pills. Det. Procaccini and Det. Thompson interviewed the female subject who was identified as Jamie R. Tate. Tate stated

that she was injured about a year ago and was prescribed pain killers. She began to abuse the pills and when she would run out she would find people to sell her more. Two months ago she met a female she identified as Shirley (Price). Shirley had curly red hair and lived with her boyfriend David Asbury. Tate said Shirley sells several different types of pills and usually has Oxycodone and Oxycontin in any milligram you want. Tate said Shirley gets her pills from Connie (Edwards) who is the big drug dealer in town. Shirley sells the pills for Connie and Tate usually goes to buy pills from Shirley 4 times a week. Det. Procaccini asked Tate if she had ever bought pills directly from Edwards. Tate said she did purchase three 60 mg Oxycontin pills from Connie for $35.00 each. Tate said the pills were red in color. Tate was asked if David Asbury had anything to do with selling pills. Tate said Asbury was very sick and would lie in bed with a gun on his chest most of the time. Tate said the pills were usually on the night stand in baggies next to Asbury. Tate also said a couple months earlier she heard that someone came inside the house and stole some of the pills and Asbury shot at him as the man ran away. Tate also stated that she was over at Shirley's house about a month and a half ago and Connie showed up. Connie and Shirley were arguing over the pills being stolen. While Connie was there Tate asked her if she could get 60 mg oxycodone pills and Connie walked out to her vehicle and sold her three pills. Tate said Shirley also rents her house from Connie.

On August 31, 2010, SA Traci Fruit, Det. Jeremi Thompson and Det. Procaccini met with Confidential Informant CI-560. CI-560 had arranged to purchase prescription pills from Shirley Price at her residence located at 1038 S. Locust. CI-560 was given $140.00 in US currency from KBI buy funds. SA Fruit drove the CI-560 to the residence of Shirley Price. CI-560 entered the residence at 9:25 pm, and came out of the residence at 9:31 pm. SA Fruit turned over three red 60 mg Oxycontin tablets and one blue 15 mg Morphine tablet. CI-560 stated that Shirley Price sold the Oxycontin for $40.00 each and $20.00 for the Morphine tablet. CI-560 said Shirley could take the CI to a person that had all the 80 mg Oxycontin pills they would want.

On September 1, 2010, SA Fruit and KBICI-180 made a undercover purchase of two 60 mg Oxycontin tablets and three 15 mg Morphine tablets for $100.00 from Shirley Price at her residence located at 1038 S. Locust.

On September 2, 2010, CI-560 made a controlled buy of two 80 mg Oxycontin tablets and four 15 mg Morphine tablets from Shirley Price at her residence located at 1038 S. Locust.

On September 3, 2010, FRDEU collected the discarded trash from the residence of 1003 S. Elm in Ottawa. The following items were collected: a medical wristband for Angela I Edwards dated August 31, 2010 with the names Jo Gollier (a physician in Ottawa) and K Fellows; a receipt from Assoc in Family Care at 2102 Baptiste Drive Paola, Kansas with the name Angela Mitchell; a Walgreens receipt for a prescription purchased on August 31, 2010 at 8:48 pm; and a handwritten note for Patient Satisfaction team meeting with the date August 26, 2010 with the time 1- 2 pm.

On September 8, 2010, SA Fruit made an undercover purchase from Shirley Price at her residence located at 1038 S. Locust. SA Fruit purchased two 60 mg Oxycontin tablets and one 200 mg morphine tablet for $120.00.

On September 9, 2010, SA Fruit went to the residence of Shirley Price located at 1038 Locust. Price told SA Fruit that she was out of pills and was waiting on her supplier to come over. Surveillance was established on Edwards' residence. Several hours later Edwards was observed leaving her residence at 412 S. Sycamore. Edwards drove directly to 1038 Locust and Shirley Price was observed getting into Edwards' vehicle. Shirley Price stayed in the vehicle for approximately

15 minutes but ran back and forth to the house several times. Edwards left the area and two vehicles pulled into the driveway of Shirley Price's house. Both subjects were inside for a short time. Edwards drove back to Shirley Price's residence and it was unclear what happened. Edwards then drove back to her residence. After surveillance observed all this, Shirley Price called SA Fruit and told her to come over to pick up what she needed. SA Fruit went back to 1038 S. Locust and purchased two 60 mg Oxycontin tablets and three 200 mg Morphine tablets for $220.00. Shirley Price also gave SA Fruit a business card for Dr. Kerri Fellows.

On September 9, 2010, Det. Procaccini was told by Ottawa Police Officer Tony Hurtado that a female subject he was transporting to jail requested to talk to him. Det. Procaccini went to the jail to interview the female subject who was identified as Bobbi J. Ledom. She said she could buy prescription pills from her sister-in-law Tammy Ledom. Tammy Ledom lives at 816 Lincoln. Bobbi Ledom said Tammy goes to a doctor and gets whatever she wants. Bobbi said Tammy rents from Edwards and Edwards buys pills from Tammy and/or takes pills in trade for rent. Bobbi also said that Tammy gets methamphetamine from Edwards time to time. Bobbi said she was aware of who Edwards is because she also use to rent from her at 727 S. Mulberry approximately two and a half years ago. Bobbi stated that she paid $350.00 a month for rent and paid that money to Edwards. Bobbi also said that Tammy told her she gave Edwards pills for the deposit on the place so they could move in but Bobbi did not see this. Bobbi said she would buy from Tammy.

On September 17, 2010, SA Fruit went to the residence of Shirley Price located at 1038 S. Locust to make an undercover purchase. SA Fruit purchased two 200 mg Morphine tablets, five 30 mg Oxycodone tablets, and one 2 mg Alprazolam tablet for $180.00.

On September 17, 2010, FRDEU worked with CI-593 who made a controlled purchase from Tamara Ledom at 816 Lincoln. The CI purchased five 60 mg Oxycontin tablets for $150.00. The tablets were sold to the CI in the prescription pill bottle. The label on the bottle read Tamara Ledom and the prescribing physician was K. Fellows. We received the Medicaid report on Tamara Ledom and Dr. Kerri Fellows had prescribed Tamara 52 prescriptions.

On September 22, 2010, Det. Proccaccini went to Walgreens located at 15th and Main in Ottawa. Edwards' vehicle was at that location then left. The vehicle drove from Walgreens to 1742 S. Elm the residence of Bivens. Several minutes later Det. Procaccini observed Edwards' vehicle leave as a red truck with a camper shell followed. This truck has been observed at Edwards' residence on several other occasions. Both vehicles drove to 412 S. Sycamore and parked. Both vehicles remained there for at least an hour then surveillance was suspended. On September 23, 2010 Det. Procaccini learned that Bivens had gone to Walgreens and dropped off a prescription the evening of September 22nd. Bivens had a friend pick up the prescription at the drive through at approximately 8:30am. The prescription was for 80 mg Oxycontin tablets.

On September 24, 2010, SA Fruit and DEA Agent Roger Hanzlik made an undercover purchase from Shirley Price at her residence located at 1038 S. Locust. SA Fruit purchased two 60 mg Oxycontin tablets for $70.00. Shirley Price told SA Fruit that Edwards was mad at her because she owes Edwards money and because Dr. Kerri Edwards fired Shirley Price as a patient.

On October 8, 2010, DEA Agent Roger Hanzlik made an undercover purchase of two 100 mg Morphine tablets from Shirley Price at her residence located at 1038 S. Locust.

SA Fruit subpoenaed the bank records from People's Bank in Ottawa, KS for Angela Edwards Mitchell. Angela Edwards (Mitchell) opened an individual checking account on April 16,

2003. She is listed as the only account owner and the only one with account access. On April 22, 2003 Angela Edwards (Mitchell) opened an individual savings account. Once again she is listed as the account owner and the only one with access. Edwards is not employed and has no legitimate source of income. Robinson's only employment is as a disk jockey working sporadically. Mitchell, Robinson and Edwards are the registered owners of several vehicles and properties in Ottawa, KS. Angela Edwards Mitchell, was employed as a registered nurse, however, none of her legitimate income was deposited into her People's Bank accounts which appear to be used mainly by Edwards. The March 2010 savings statement shows an account balance of $35,248.92. This account is used by Edwards to deposit rent checks and cash proceeds from illegal prescription drug sales. Robinson uses this account to pay Franklin county property taxes for residences used for drug distribution and storage. Edwards lists Mitchell's checking account as her own and has utilized it to pay for vehicles, utilities, and over $12,000 in Ebay purchases. Over $65,000 in cash deposits have been made into the checking account during the conspiracy time period.

On February 28, 2012, a search warrant was executed at Bivens residence located at Lot 24, 23000 South 368 Highway in Vassar, Kansas. Bivens was located in the master bedroom and arrested. Multiple prescription bottles and pills including an oxycodone prescription for "Angela Mitchell" and morphine and methadone prescriptions for "C.Edwards"; multiple oxycodone, oxycontin, morphine, amitriptyline, trazadone, hydrocodone prescription bottles and pills for B. Bivens, a digital scale, gambling receipts, a bag of lottery tickets and marijuana were recovered from the residence.

On February 28, 2012, a search warrant was executed at one of Edward's residences located at Lot 20, 22975 South 368 Highway in Vassar, Kansas. Officers recovered several prescription bottles containing various medications including prescriptions for oxycodone which were not prescribed to Edwards. Drug ledgers and a .44 caliber revolver were also recovered.

On February 28, 2012, a search warrant was executed at one of Edward's residences located at 412 South Sycamore in Ottawa, Kansas. Multiple prescription bottles and pills including an 80mg oxycontin, hydrocodone, citalopram and oxycodone prescriptions for "B. Bivens" and an oxycontin prescription for "Angela Mitchell"; multiple "Soma" casiprodol, methadone, hydrocodone, trazodone, morphine, clonazapam, oxycontin, oxycodone, omeprazole, lorazapam and various other prescription bottles and pills for Edwards, several external computer drives and computers, drug ledgers and marijuana were recovered from the residence. Many of the prescription pills were found in a safe in the locked master bedroom occupied by Edwards and Rick Robinson.

Morgan Price was interviewed by law enforcement following the arrest of Connie Edwards. Morgan stated that in late 2008, she purchased purported methamphetamine from Tamara Ledom and Connie Edwards. Price had purchased methamphetamine and morphine from Edwards previously for herself and her ex-husband, John Clark. On this occasion Morgan and Clark got into Edwards' van to pick up the methamphetamine and Ledom handed her the drugs. Morgan and Clark paid for the methamphetamine and were dropped off at her mother, Shirley Price's, house in Ottawa, Kansas. Morgan injected the purported methamphetamine and knew immediately it was not methamphetamine. Morgan's arm began to swell and by the next day she could no longer move it. Morgan went to the emergency room for the injury, it took two months for her arm to heal following the injection of purported methamphetamine. Shirley Price confronted Ledom and Edwards about selling "bad drugs" to Morgan. Morgan did not buy anymore drugs from Ledom, however, she

continued to buy morphine tablets from Edwards. Morgan also purchased morphine pills from Brandi Bivens at a trailer near the Franklin County, Kansas fairgrounds when Edwards was unavailable.

On March 26, 2012, cooperating witness 1 (hereinafter CW1) was interviewed by law enforcement officers. CW1 stated Dustin Price had a gun which he obtained from either Mark Ambler or Kenny Bellinger. CW1 said the Connie Edwards was a prescription drug supplier who used Dustin Price to run pills for her. Edwards supplied morphine to CW1 on a regular basis. Edwards also sold liquid morphine which she obtained from Angela Mitchell who was a nurse. Edwards also obtained prescription pills from Joel Keith Price, Shirley Price and others in exchange for rent, Edwards would then sell the pills at an inflated price oten to the people who had supplied them to her in the first place. Edwards asked CW1 to obtain prescriptions for her to sell but CW1 declined. Edwards also accepted stolen merchandise and odd jobs from people in exchange for pills. Edwards drove people to area stores to shoplift for her in exchange for prescription drugs. Edwards' boyfriend Rick Robinson also assisted Edwards by distributing pills to CW1 and Shirley Price which they had ordered from Edwards. CW1 reported that Edwards had been involved in the overdose death of William Thomas Powell.

On June 19, 2012, a cooperating witness (hereinafter CW2) was interviewed by law enforcement officers. CW2 stated that Tamara Ledom had confessed that she had sold methamphetamine in Franklin County, Kansas. Ledom advised that she was supplied with methamphetamine by Connie Edwards for $140 to $160 per gram, which Ledom considered too high a price. Ledom would get Hydrocodone and Oxycodone pills for Edwards who sold them in Ottawa, Kansas. Ledom advised that one time they crushed up Hydrocodone, Methadone and Naproxen and sold them as methamphetamine to a "kid" who injected the fake methamphetamine and died. CW2 stated that Ledom advised this occurred a "couple years ago" at Edward's house on Sycamore and another individual named Shirley Price was there working in the garden. Ledom said that she and Edwards had sold crushed up pills as methamphetamine before. Ledom was worried the police would figure out they had killed the person because he called and texted her before he died asking what Ledom had given him.

On June 26, 2012, a cooperating witness (hereinafter CW3) was interviewed by law enforcement officers. CW3 first met William Thomas Powell at Connie Edwards house at 412 Sycamore in Ottawa, Kansas. CW3 had seen Powell, his girlfriend Sam LNU, and his father Michael Powell previously at the Sycamore residence buying pills two to three times a week from Edwards where CW3 often worked. CW3 worked odd jobs for Edwards and Rick Robinson in exchange for oxycodone, morphine and methamphetamine. Odd jobs included cleaning house, working on home improvement projects, giving Robinson and Edwards pedicures and other tasks. Both Edwards and Robinson would give CW3 pills to take before beginning her work at the Sycamore house. CW3 last saw William Thomas Powell the afternoon before he died at Edwards house. Powell bought methadone and carisoprodol "Somas" from Edwards and Ledom, CW3 thought he might have also gotten some Klonopin but was unsure. Late that evening Powell got more drugs from Edwards who was driving her white mini-van. Powell was found dead the next day. CW3 recalled Tamara Ledom and Edwards were blaming each other for the death because both had sold him pills but Ledom's pills had been crushed up. Ledom told CW3 she was the last person Powell contacted before he died. CW3 stated that Ledom and Edwards had previously sold crushed

up pills as methamphetamine and another user had ended up in the hospital after injecting it but they continued to sell the fake methamphetamine. CW3 said Edwards took people to stores to shoplift for her in exchange for pills including CW3, Morgan Price and others. CW3 said Edwards used rental properties in Mitchell's name to get people to obtain prescriptions in exchange for rent. CW3 advised Edwards had Dustin Price and Brittany Edwards distribute pills for her out of the house on Sycamore. Brittany Edwards also delivered pills to customers and collected money for Edwards. Edwards obtained prescription pills from Joel Keith Price for distribution. CW3 said Naomi Mock also did odd jobs for Edwards and Robins and was prostituted by Edwards in the basement of Sycamore for pills. Edwards also sold liquid morphine. CW3 had $900 worth of pills fronted by Edwards stolen from her. CW3 continued to try to pay off the debt selling pills and working for Edwards and Robinson. CW3 accompanied Edwards to her bank on the first of each month to get money out to give to Edwards for pills she had been fronted, Edwards then deposited the money at People's Bank and Bank of the West. Bivens sold prescription pills for Edwards and sold pills on the side. CW3 observed Edwards and Bivens fight over money and drugs often. Edwards also sent CW3 to work for Bivens in exchange for morphine on a few occasions.

On August 1, 2012, a cooperating witness (hereinafter CW4) was interviewed by law enforcement officers. CW4 stated that Tamara Ledom had admitted to them that she had sold a young man fake methamphetamine and it had killed him. Ledom relayed that the man had died a few years prior after buying crushed up pills that Ledom purported to be methamphetamine. Ledom was concerned because the individual had texted her before he died asking what she had given him.

The drug exhibits mentioned herein were transported to the Kansas Bureau of Investigation laboratory where they tested positive for the substances stated in the quantities listed herein.

3. **Proposed (c)(1)(C) Sentence.** The parties propose, as an appropriate disposition of the case, a sentence of 25 years imprisonment for Count 1 of the Third Superseding Indictment which charges the defendant with Conspiracy to Distribute controlled substances resulting in death or serious bodily injury in violation of Title 21 U.S.C. § 846 and Title 18 U.S.C. § 2; 5 years of supervised release; a forfeiture allegation; no fine; and the mandatory special assessment of $100 to be paid during the defendant's incarceration. The parties seek this binding plea agreement as an appropriate disposition of the case because it brings certainty to the sentencing process and assures that the defendant and the government will benefit from the bargain they have struck if the Court permits itself to be bound by the proposed sentence; the interests of justice are served by the sentence, thereby assuring that the sentence is consistent with the sentencing factors of 18 U.S.C.

§ 3553(a); and if the Court does not agree with the sentence, the parties may be restored to the positions they maintained prior to reaching this plea agreement. This agreement centers on the defendant's agreement to enter this guilty plea as soon as the Court's schedule permits, thereby preserving valuable Court, prosecution, public defender, probation office, U.S. Marshals Service and other law enforcement resources.

4. **Application of the Sentencing Guidelines.** The parties are of the belief that the proposed sentence does not offend the now advisory sentencing guidelines, but because this proposed sentence is sought pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence.

5. **Government's Additional Agreement.** In return for the defendant's plea of guilty as set forth herein, the United States Attorney for the District of Kansas also agrees to not file any additional charges against the defendant arising out of the facts forming the basis for the Indictment.

6. **Whether to Accept the Proposed Plea Agreement and Sentence is Up to the Court.** The Court has no obligation to accept the proposed plea agreement and sentence. It is solely within the Court's discretion whether to accept the proposed binding plea agreement as an appropriate disposition of the case.

7. **Withdrawal of Plea Permitted Only if the Court Does Not Accept the Plea Agreement and Proposed Sentence.** On the other hand, if the Court agrees to be bound by proposed plea agreement and accepts the defendant's plea of guilty, the defendant will not be permitted to withdraw it. Only if the Court rejects the proposed plea agreement will the defendant be permitted to withdraw his guilty plea.

8. **Payment of Special Assessment.** The defendant understands that a mandatory special assessment of $100 will be entered against the defendant at the time of sentencing. The parties acknowledge the defendant is without adequate resources to pay the special assessment at the time of sentencing and agree to recommend that the Court order payment to occur during the defendant's period of incarceration.

9. **Waiver of Appeal and Collateral Attack.** The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, the defendant's conviction, or the components of the sentence to be imposed herein including the length and conditions of supervised release. The defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the conviction and sentence imposed. By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate by the court. The defendant also waives any right to challenge a sentence or otherwise attempt to modify or change his sentence or manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, U.S.C. § 2255 [except as limited by United States v. Cockerham, 237 F.3d 1179, 1187 (10th Cir. 2001)], a motion brought under Title 18, U.S.C. § 3582(c)(2) and a motion brought under Fed. Rule of Civ. Pro 60(b). In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, the court departs upwards from the applicable sentencing guideline range determined by the court. However, if the United States exercises its right to appeal the sentence imposed as authorized by Title 18, U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received as authorized by Title 18, U.S.C. § 3742(a). Notwithstanding the forgoing waivers, the parties understand that the

defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.

10. **Waiver of FOIA Request.** The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, Title 5, U.S.C. § 552, or the Privacy Act of 1974, Title 5, U.S.C. § 552a.

11. **Full Disclosure by United States.** The defendant understands the United States will provide to the court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case. This may include information concerning the background, character, and conduct of the defendant including the entirety of the defendant's criminal activities. The defendant understands these disclosures are not limited to the count to which the defendant has pled guilty. The United States may respond to comments made or positions taken by the defendant or defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The defendant also has the right to provide information concerning the offense and to make recommendations to the court and the United States Probation Office.

12. **Parties to the Agreement.** The defendant understands this plea agreement binds only the defendant and the United States Attorney for the District of Kansas, and that it does not bind any other federal, state, or local prosecution authority.

13. **Identification of Assets & Agreement Concerning Monetary Penalties.**

A) The defendant agrees to disclose to law enforcement officials the existence and status of all monies, property or assets, of any kind in which he has sole, joint or partial ownership or control OR was derived from or acquired as a result of, or used to facilitate the commission of the crimes charged. Furthermore, the defendant agrees to provide all of his financial information to the United States Attorneys Office at the same time that he provides such to the United States Probation Office as part of the presentence investigation procedure. Defendant consents to the release of the information from the United States Probation Office to the United States Attorneys Office should s/he neglect to separately provide such information to the United States Attorneys Office. Moreover, defendant agrees, if requested by either the United States Attorneys Office or the United States Probation Office, to participate in a pre-sentencing debtor's examination, which may include the taking of information from the defendant under oath.

B) The defendant further agrees to prevent the disbursement of any monies, property or assets derived from the crimes charged, or otherwise under his/her custody or control. If the defendant fails to comply with this provision the United States is relieved of its obligation to recommend a sentencing reduction for Acceptance of Responsibility pursuant to § 3E1.1, to file a 5K1.1 motion, or any other sentencing recommendations contained in this agreement.

C) The defendant understands and agrees that, pursuant to Title 18, United States Code, Section 3613, whatever monetary penalties are imposed by the court will be due and payable immediately and subject to immediate enforcement by the United States as provided for in Section 3613. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If the defendant is incarcerated,

the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

14. **Deportation Consequences**. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under Federal law, crimes involving controlled substances, firearms, aggravated felonies, or moral turpitude are deportable offenses; and the defendant's plea to any such crime may subject him to automatic deportation and removal from the United States. See 8 U.S.C. § 1227(a)(2) et. seq. Defendant affirms that he has been advised of the immigration consequences of pleading guilty and wants to plead guilty regardless of any immigration consequences that may result from his plea, even if such consequence includes his automatic deportation and removal from the United States.

15. **No Other Agreements.** The defendant has had sufficient time to discuss this case, the evidence, and this agreement with the defendant's attorney and defendant is fully satisfied with the advice and representation provided by defendant's counsel. Further, the defendant acknowledges that he has had the plea agreement read to him, understands it and agrees it is true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this agreement embodies each and every term of the agreement between the parties. The defendant acknowledges that the defendant is entering into this agreement and is pleading guilty because the

defendant is guilty and is doing so freely and voluntarily.

*[signature]*                                              Date: 11-8-12

Sheri McCracken
Assistant U.S. Attorney
500 State Ave. Suite 360
Kansas City, KS  66101
(913) 551-6730
Ks.S.Ct. # 17097
Sheri.McCracken@usdoj.gov

*[signature]*                                              Date: 11-9-12

KIM I. MARTIN, # 13407
AUSA/Criminal Coordinator
500 State Ave., Suite 360
Kansas City, KS  66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)

*[signature]*                                              Date: 11-21-12

Connie Edwards
Defendant

                                                           Date: 11-21-12

*[signature]*

Kirk C. Redmond
Office of Federal Public Defender - KCK
500 State Avenue, Suite 201
Kansas City, KS 66101-2400
913-551-6712
Fax: 913-551-6562
Kirk_Redmond@fd.org

16